IDA LORICH, Claimant, *v.* STATE OF NEW YORK.

Claim No. 16188.

(State of New York, Court of Claims, November, 1920.)

Court of Claims — jurisdiction — Laws of 1919, chap. 579 — strikes — negligence of National Guard in firing into crowd.

The statute (Laws of 1919, chap. 579) conferring jurisdiction upon this court to hear and determine a certain claim against the state for personal injuries caused by the alleged negligence of certain members of the National Guard of the state, who had been ordered out to preserve order while a strike was in progress, and authorizing an award of damages if the same was justified by the evidence, is neither an audit nor an allowance of the claim. (Pp. 413, 414.)

To entitle the claimant to a recovery, the court must find that the guardsmen who fired into the crowd were not, in the circumstances, exercising reasonable precaution and due

care, and that the claimant on the evidence was justly and equitably entitled to compensation regardless of legal rules and principles.  (P. 415.)

Evidence that when the order to fire was given and immediately previous thereto, the sergeant and his men were in no danger, were not resisted, menaced or attacked, and that the crowd was fifty feet from them and running away, and that claimant and her witness were shot in the back, satisfactorily establishes that the shooting was not a reasonably prudent or careful act, and claimant will be given an award of $2,500. (Pp. 415, 416.)

CLAIM for damages caused by negligence of National Guard.

Charles F. Boine, for claimant.

John H. Clogston, deputy attorney-general, for state of New York.

CUNNINGHAM, J.  In the month of April, 1913, an extensive strike of street railway employees was in progress in the city of Buffalo.  Conditions became so parlous that Hon. Charles H. Brown, a justice of the Supreme Court, ordered out the Fourth Brigade of the National Guard of the state, for the purpose of preserving order.  On April ninth strikers, or their sympathizers, had been extremely disorderly and riotous all day.  The guardsmen repeatedly were jeered and insulted and all, or nearly all, of them were struck once or oftener.  The situation was so ominous that a riot call for the reserves was sent in by the police.  Late in the afternoon the company attempted to operate its cars on the Niagara street line.  A number of these proceeded along the street close together. About 500 people had assembled near the intersection of Niagara and Tonawanda streets, at which point a New York Central railway bridge spans Niagara street.  About 150 were on this bridge.  A thousand

people rushed along the street behind the cars toward the bridge. Fifteen policemen and sixty guardsmen were on duty in that vicinity. The crowd placed cable-drums and other obstructions on the street-car tracks at the bridge, stopping the cars under it. Persons on the bridge dropped or hurled down fish-plates, a railroad tie and other objects. One man attempted to throw a wire over the trolley feed-wire and thus short circuit and sever it. Some one, in fact, did cut it, destroying the power. Meantime, persons in the street threatened the soldiers and police and hurled stones, bricks and other missiles at them. One of the claimant's witnesses, a police officer, the target for such an attack, drew his revolver in defense, but was prevented from shooting his assailant by another officer. A passenger train of the New York Central Railroad Company stopped at the Black Rock station just westerly of the bridge, and many persons boarded this train, armed with missiles of various kinds, and as the train passed over the bridge hurled them to the street at the officers and the guardsmen. Previous to the arrival of the cars at the bridge, a policeman without using force cleared the bridge of people, but they surged back again immediately. Two old and experienced police officers who testified for the claimant, and one who was a witness for the state, testified that it was the most vicious and threatening crowd with which they ever had had experience, including the two great railway workers' strikes in Buffalo of previous years. The soldiers were armed with loaded guns and fixed bayonets and had been ordered to shoot if necessary. Their captain in the street below the bridge ordered a sergeant and a detail of two or three men to clear the bridge. So far as military practice is concerned, the discretion whether and when the detail should shoot was in the sergeant in command. As they

started for the bridge, a police officer below called to
the crowd, " My God, get back, you will get shot."
The sergeant soon after reaching the bridge gave
orders to his men to shoot, which they did, and the
claimant, who was in the crowd on the bridge, was
shot through the body.  The bullet entered her back,
breaking a rib, slightly fracturing another, penetrat-
ing her lung and emerging in front.  She was enceinte
at the time, but there is no proof that her condition
in this respect was affected by the wound.  She was
removed to the hospital, and for a long period was
under surgical care, suffering great pain and enduring
effects which are permanent.  The facts detailed
above substantially are not disputed.  The claimant
testified that she had no interest in the strike and no
relatives involved in it; but that she knew of its exist-
ence, the fact that the militia had been called out in
connection with it and that the cars must be run.  She
says that on this afternoon, her younger brothers not
arriving home from school promptly after its dis-
missal at three o'clock, as was their invariable cus-
tom, their mother, a helpless cripple, directed the
claimant and her sister, at four-ten P. M., to search
for them and bring them home.  She says that
she and her sister departed for the purpose, and were
told by some boys that their brothers were at the
bridge.  On arriving there, an officer prevented them
passing under the bridge.  They saw the crowd on
the bridge, and the claimant climbed upon it and talked
to a boy friend of their brothers a few seconds, but not
finding their brothers, the claimant was leaving the
bridge and had proceeded a distance of about ten feet,
when the shots were fired and she was wounded.  She
asserts that she observed nothing disorderly or threat-
ening in the action of the crowd; that she heard no
command or direction to leave the bridge.  Some of

claimant's witnesses testified that about 50 people
were on the bridge, but her claim alleges that about
150 people were there and she testified that the crowd
numbered about 100. Her sister and another witness
likewise testified that they saw no disorder and no
missiles thrown. A police officer, testifying for the
claimant, asserted that he heard no command given
by the sergeant to the crowd to move or disperse,
although he was as close to the officer as the crowd,
and that he saw no act of resistance by the crowd to
the soldiers as the latter advanced across the bridge.
Another police officer, a witness for the claimant, said
the crowd was getting off the bridge when the sol-
diers fired, and no one was advancing toward the
latter, the nearest person to them being fifty feet away,
and that the soldiers took aim and fired. The sergeant
testified that fifty people were on the bridge proper
and 300 to the north of it, that the advance of the
soldiers on the bridge was met by a shower of missiles,
that when the soldiers had advanced ten or fifteen
feet northerly on the bridge, the large crowd at that
end rushed towards the soldiers, and others on the
bridge also turned to the attack, and again missiles
were hurled at them, whereupon he held up his hand
and gave orders to his men to fire in the air, if the
crowd did not halt, and that after the shooting the
crowd on the bridge dispersed. This claim is for the
alleged negligence of the guardsmen in the premises,
and is filed pursuant to the provisions of chapter 579
of the Laws of 1919, which became a law May 12, 1919,
and reads as follows:

" § 1. Jurisdiction is hereby conferred upon the
court of claims to hear and determine the claim of
Ida Lorich against the state for personal injuries
caused by the alleged carelessness and negligence of
certain members of the New York State National

Guard in shooting her through the body in the City of Buffalo, New York, on the ninth day of April, nineteen hundred and thirteen, if claim therefore shall be filed within one year after this act takes effect.

" § 2. If the facts proved before said court of claims should establish a just and equitable claim in favor of said Ida Lorich against the state, for damages for personal injuries, the said court may determine that the state is liable therefor and award such sum as may be just and equitable, not exceeding the sum of fifteen thousand dollars. Nothing herein contained shall be construed as an admission of liability on behalf of or on the part of the state of New York.''

This statute is not an audit or allowance of the claim by the legislature. That result could not be accomplished validly by legislative enactment. Const. art. III, § 19; *Munro* v. *State of New York,* 223 N. Y. 208; *Wheeler* v. *State of New York,* 190 id. 406; *Roberts* v. *State of New York,* 160 id. 217; *O'Hara* v. *State of New York,* 112 id. 146; *Cole* v. *State of New York,* 102 id. 48.

The statute (1) confers jurisdiction on this court to hear and determine the claim of the claimant for personal injuries caused by the negligence of the guardsmen in shooting her; and (2) authorizes the court to find the state liable and render an award, if the facts proved establish a just and equitable claim in favor of claimant for personal injuries; and (3) in the event of the determination of the two foregoing propositions in favor of the claimant, to render an award against the state for such a sum as may be just and equitable, not exceeding $15,000.

Of course, it is obvious, particularly since recent pronouncements of the Court of Appeals, that there could be no recovery by the claimant in the absence of this special statute. Our inquiry under it has a nar-

row range. To entitle the claimant to a recovery, we must find that the guardsmen who fired into the crowd were not in the exercise of reasonable precaution and due care, under all the circumstances, and determining that, then also, that the claimant has established a claim for her injuries, which *justly and equitably* entitle her to compensation, regardless of legal rules or principles. The inquiry thus becomes one of fact only, and it is not without difficulty. In reaching our conclusion we desire to make it clear that it is predicated solely upon the specific and particular facts and the statute here involved. A preponderance of the evidence establishes to our satisfaction that the shooting was not a reasonably prudent or careful act. It is true that the provocation of the guardsmen had been extreme, but it is clear to us that when the order to fire was given, and immediately previous thereto, the sergeant and his men were in no danger, were not resisted, menaced or attacked, but on the contrary, the crowd was fifty feet or more away from them, and with backs turned, were running away. The claimant, both police officers who testified for her and two of her other witnesses established these facts. The only testimony to the contrary is that of the sergeant in command, and his evidence to the effect that he ordered his men to shoot in the air is incredible. The incontrovertible physical fact is that the claimant and her witness Muma, the only two persons who were wounded, were shot in the back. Whatever may be said of the situation which faced the guardsmen and police at other times during the day, it is clear to us that the shooting of the claimant was perpetrated contrary to due care and prudence, under all the circumstances existing at that time. No reasonably prudent and careful officer, unresisted, unmenaced and unthreatened, would have ordered his

men to fire into the backs of a fleeing crowd of citizens, whatever their previous offensive demeanor or provocation might have been. Uncontroverted evidence in this case establishes the blamelessness and innocence of the claimant's presence at the scene. We would have no hesitation in dismissing this claim, however, if it appeared that the shooting was done by the guardsmen in self defense, or when they were seriously resisted, menaced or threatened. We desire not to be misunderstood; we do not question the right and the duty of the state's soldiers to shoot, when that shooting is done under circumstances which justify it, as reasonably careful or prudent, but the facts disclosed in this case did not justify it as either careful or prudent.

The claimant is justly and equitably entitled to an award in the sum of $2,500.

ACKERSON, P. J., concurs.

Award accordingly.